We're back in the record. The next matter on calendar is Rodney Schuman v. Icon Office Solutions 0516297. That matter has been submitted without oral argument on the briefs and will stand submitted as of today. The last matter on calendar for argument is GameTech International v. Trend Gaming Cases 0515626, 0516026, 0516542. Now, we do have on this case, we've got sort of appeals and cross appeals. And so we've got to probably ascertain, you know, how we're going to fat. You each have 20 minutes, and so that would give each of you an argument for rebuttal on one part of it. So perhaps counsel for GameTech could come to the podium first, and let's ascertain how we're going to handle our time, because I notice you have one more person at counsel table. So maybe you can tell me how you propose to handle your time, and I'll see whether we agree or not. Yes, Judge Callahan. I will be the only one arguing. Okay. And what I anticipated was taking 18 minutes for argument and saving two for rebuttal, and I wouldn't take a second rebuttal if that was something that you were suggesting. Well, are you going to – I mean, I think it's not that this isn't all related, that we don't know. So, well, I mean, your rebuttal is actually on the case that you appealed. So are you going to – do you want to hear what counsel for Trend is saying on their particular appeal, or do you think that you can cover that all in the first 18 minutes? Because there are so many issues, and I'm not going to try to address all of them, I will probably say little or nothing about the Daubert issue, which is the issue on cross-appeal, until the last two minutes, and then I'll just try to be very brief about that. If I have time in the 18 minutes, because that's where the court asks questions or whatever, I may get into it. All right. Well, why don't you do your 18 minutes and save your two if, you know, if at the close of it, if either of you feel that for, I mean, within reason, if that – didn't have an opportunity to say something, I might be inclined to give you a minute or two as far as that goes. Thank you, Your Honor. Jeffrey Walsh, appearing for the appellant cross-appellee, Game Tech International. All right. A belated good morning. And I was the counsel who tried the case, and I wanted to start out by mentioning the dilemma that we were in as a result of the court's rulings, the trial court's rulings, Magistrate Judge. I stood in the well of the courtroom, 504N, the Sandra Day O'Connor Building, on October 7, 2004, in the midst of the trial of this matter, and I had our CEO, our then president, Claire Thiessen, on the stand, and I wanted to ask him a critical question that I felt I could not ask him that was central to the case, which was why did Game Tech terminate trends, distribution rights, in the summer of 2002? The reason that I felt that I could not fairly ask him that question was because of various summary judgment and motion-eliminating rulings that the magistrate judge had entered. He was going to say Virginia. He was going to say Virginia. That's correct, Your Honor, to put it in the nutshell. He was going to say I knew exactly what was being done to us in Virginia. The plan was succeeding so well in Virginia that I could see what was beginning to happen in Texas. I couldn't take that Virginia hat off and act like I didn't know that the same man who owned essentially the same company in Virginia was starting the same thing with us in Texas. And because he couldn't answer it fully and honestly under penalty of a mistrial, I really didn't feel I could properly put the question to him at all. I had to pussyfoot around what was really happening in the case. And we've cited, Your Honors, to United States v. McCrae, a Fifth Circuit decision that said, you know, when you try a case on an unreal set of facts, a fantasy, you've really abused 403. Well, the summary judgment, I think, kind of goes to the crux of everything here in terms of because the summary judgment, if the summary judgment were properly granted, let's assume that for a moment, then I think when you get to the 403, it's an abuse of discretion, which is a steep hill to climb as far as If the summary judgment were not properly granted, then I think your probative value goes up in the 403 analysis. So I don't want to conflate the issues, but in a way that there is a little domino effect here, or they do have some relationship to each other. But now, on the summary judgment, which is, to me, the most difficult issue here, you have a contract, and it comes down to, I think the judge ruled against you in the sense that said that on whether, using the generic contracts did not violate, as a matter of law, promoting or retaining language. Is that correct? He actually ruled two different times, two different ways. On the summary judgment ruling itself, Judge Callahan, what he said was, and I'll quote it to you, reasonable jurors could not disagree that the use of generic contracts for five out of a total of 58 conductors do not constitute willful failure to promote, resulting in a material breach of the distribution agreement. We took that to mean we could still litigate whether there was a breach. It would not have been a material breach, thus alone being able to justify termination. Once the judge got to or we got to trial and the judge was ruling on motions in limine, however, the ruling got a bit different. And the judge ruled it is further ordered that GameTech, its employees, and I'm quoting again, GameTech, its employees, representatives, attorneys, and witnesses are hereby prohibited from questioning, commenting upon, or arguing before the subject jury that the use of generic contracts alone constitutes a breach of the distribution agreement. So we've now gone from material breach to a breach, which really put me in a dilemma with questions for the client. All right. So that's the ultimate ruling, though. That seems to be the ultimate ruling. Then, however, the judge gave the jury a limiting instruction at the beginning of the trial and said something that seemed to be in conflict with that altogether. What he said was evidence concerning Trenn's use of generic contracts may only be considered in your determination of whether Trenn breached the covenant of good faith and fair dealing, but may not be considered as a basis for GameTech's termination of the distribution agreement. Seemingly not making it clear whether he was ruling that it was a material breach or whether we could still argue that it was a breach of the contract language itself and not just a breach of the good covenant and fair dealing. But we were in a terrible quandary as to how to proceed. It was something that I pointed out to the Court when he was fashioning this limiting instruction that I thought it was going to be terribly confusing. But the upshot of all of it is all three of these rulings are incorrect as a matter of law, because we were dealing with a question of fact that should have gone to the jury. Well, let me just, okay, it really comes down to the, you have a contract, and so we're interpreting the language of the contract, all right? And it's summary judgment in this instance. All inferences are in favor of you. And as far as I can tell, all right, so I don't know about the word retain. I don't think it applies to that so much. It's more the promote. Now, generic contracts, one of the things that the judge said, if it was really important to you, you could have had, you know, in your contract language to say that all of the contracts that go out to these, what distributors is that? Well, from the distributors to the customers. To the customers, have the name Game Tech in there. And so if I were to make the best argument for you that I can see right now, and the question is, is this enough to create a tribal issue or whatever, you had in the record that you have the Virginia situation in the record, that when there's a notification that the contract's not going to be renewed, then they go to the generic contracts. They didn't use those before, and then they go to that. And after that, then you have the next step, which doesn't occur here, but did occur there. They go to BATINA then. They change to BATINA. All right. And so you don't in Texas have those facts that they actually went to someone else. And I think clearly if you got to that point, if you had that point, if they'd gone to BATINA in Texas, I think clearly there would be an error in granting the summary judgment. But the fact that they didn't do that, but then you introduce that evidence, you know, promotive intent or whatever, is that enough? And also, does putting the name in the contract, does that really promote, what does that promote? Is that? They didn't contract for it, so it wasn't that important that they said that that specifically has to be. I mean, what are the things that have to do with promote? Well, there are actually four clauses, not just a duty to promote. But let me start out by saying that this distribution agreement is not unlike many commercial contracts that this Court probably sees. Parties to a contract don't often list everything you must do and everything you're prohibited from doing. What they do is they set forth a central purpose, and they have language in there that's general language. Yes, there is no clause in there that says you must use a written contract that says game tech, and there's nothing in there that says you are prohibited from using a contract. I'd say that all that they had done was that they just put some little star up in the corner of the contract. That's the way that they changed that. Now, clearly, as a matter of law and something like that, you would have to lose then. What would the star be signifying? Well, they used the same kind, but, you know, that's all that it is. And so there's no evidence of anything else. You know, it can't contemplate any little change as far as that goes. It would have to do something. Here it's just a question of the use of the change to the generic, the context of the time, and what happened to Virginia. Is that enough? Exactly. It's all in the context. But there are four sections, well, two sections of the contract, but four different duties. One is that the distributor will represent the products, our products, not other people's products. Two, the distributor will promote to the best of its ability. Three, the distributor shall take all commercially reasonable measures to retain. And four is in Section 3.3 that says any efforts to sell competing products. It doesn't say any sale of competing products. It says any efforts to sell competing products. There is absolutely no doubt in my client's mind at the time that it is making its decision to terminate Trend that it knows exactly what Mr. Hieronymus, the president of both the Trend entities, is doing. He is using generic contracts where he has never used them before and never given any notice that he intended to. There's no doubt in your client's mind, because that's not going to help me on this. Well, I understand that. But here's the object of facts, the facts that were before the judge. One is that under Section 4.4 of the distribution agreement, Trend is to step aside at the end of the relationship, which could be in 2009 or at Trend's election. It could be earlier. And it is going to be paid for the next year based on the assumption that it had stayed in place. In other words, what customers did Trend hand back to GameTech? Now, when I say hand back, we couldn't contract with them directly, but they would go to another GameTech distributor. So the whole contract was set up so that Trend had an economic motive to maximize the number of customers it had at the end of the contract, not to have a generic contract or any reason to take them anywhere else, because it was going to get paid for doing absolutely nothing for three years afterwards. Two is that Mr. Hieronymus had never in the seven-year history of his relationship ever used a generic contract in Texas or Virginia. He had no right to give them anybody's product but ours. Three, in the spring of 2002, for the first time, he ordered his sales force to go out and offer generic contracts to all 250 customers. Four, he issued that order just a month or two after negotiations with GameTech for more favorable terms collapsed, long-running negotiations that were in the trial record. And right after he had threatened GameTech that he was going to take the customers to another manufacturer, regardless of whether it was a breach of the distribution agreement, because they wouldn't pay him additional money and give him better terms. Next, Hieronymus linked the use of generic contracts and made them particularly attractive by cutting the pricing that he was offering to customers by 40 or 50 percent, the renegade pricing that we talked about in our briefs. And finally, he commenced this generic contracts plan in Texas within 30 to 60 days of doing it in Virginia. And finally, we were seeing his success in Virginia. I mean, there was plenty of evidence from which a judge could say, there's a question here about whether you're acting innocently and suddenly engaging in this new business approach of generic contracts or whether what you're really doing is setting up to do in Texas exactly what you've done in Virginia. And the fact that this is coming on the heels of such an acrimonious and failed negotiation over new terms, and right after you've made a threat to GameTech that you're going to take them to another distributor, and you're doing the same thing in Virginia, you're carrying through where your contract is ending, you're signing customers to new generic contracts for two-year terms, even though your contract is ending by its terms with GameTech in three months, there's plenty of evidence here for a jury to conclude that what you're doing is you're taking those initial steps, the any efforts not to promote GameTech's products to the best of your ability, but to start selling to another, selling these customers to another manufacturer. But she said it is a tribal issue on that, and that's what you're saying that goes to. Yes, exactly. It's a tribal issue of fact. Arizona law in particular, you know, allows all this extraneous evidence in. We have a reading of a general contract here. It doesn't say specifically you can or can't use a certain type of contract form, but it has all this best efforts language, commercially reasonable language, and in the context of the party's relationship and reading the contract as a whole, there was a tribal issue of fact. Once this trial judge told the jury that one of the two reasons that we had terminated a trend was wrong, that we had acted wrongfully, we were behind the eight ball and going downhill from there. Let me ask you a question about your conversion claim. Isn't the Gerke case distinguishable? In that case, the plaintiff had a clear security interest in the proceeds and the property of the distributor. We are in a lesser situation here. That's correct, Judge Nelson, because clearly the distribution agreement says that Trend collects the money from the customers and remits it to us after deducting a commission. The distribution agreement also says Trend has no obligation to pay us except for monies collected from customers. So if a customer becomes a bad credit, that's it. Trend owes us no money. So they're really just a collection agent for us. But clearly we didn't have a security interest in the document. But our view was that's really our property, our money that's being collected. They're segregating it into a bank account and they're remitting it to us weekly, and they're required to remit it to us weekly with a statement of what they're remitting. They don't have any independent duty to pay us merely because we gave them product. They're only collecting. Isn't that a problem under Texas law? If that's your money, because that's what I'm hearing you say, that's our money. It's not your money. It's a payment obligation. That's clearly Trend's argument is that we can't be in a direct contract with the customers. However, we had just gone through a proceeding with the Texas Lottery Commission that ended in January of 2002, which was something the trial judge knew about, and I don't know that we mention a lot on appeal, but we do reference it a bit, where we had been challenged, both Trend and Game Tech were respondents in that proceeding and had been challenged about the way we did business, and the Texas Lottery Commission held it lawful. Now, it didn't get, the Lottery Commission didn't get to the specific issue of is there an agency relationship, but it looked at this revenue pricing scheme and tried to determine whether in essence Game Tech had too much control and held that it was lawful. There is no precedent in Texas that says one way or another whether calling them an agent is somehow going to make us violate Texas law, but I think that we don't have to get to the point of determining whether there's an agency or not. We look at the practicalities, the de facto circumstances under the contract, and determine, you know, under these circumstances what they were really doing was holding money in trust for us and remitting it, and it was on that basis that we felt the conversion claim, really on undisputed facts, should have been granted on our Rule 50 motion. I am... It's something like a consumption trust, then, for your benefit, that they were obligated to hold it in trust. They were obligated to hold it and remit it, correct. Let me ask a question, assuming, and it may be a big assumption, that we agreed with you that the granting of the summary judgment was improper and that we agreed with you that the court's in limine order regarding the Virginia agreement was wrong, do we need to decide any other issues in this case? I think the other issue that you need to decide, Judge Nelson, is whether the other element of damages should have been excluded under Daubert, the final remaining element of damages. I think ruling on the conversion claim, I guess I hadn't thought that all the way through. Maybe that sorts itself out when we go back to trial. But on the Daubert issue, we have a clear circumstance here where the judge found three of the four damage measures were too unreliable to go to the jury. They were all on the same series of three or four pieces of paper stapled together. The same rationale was being used to justify lost profits in the three that were excluded and the one that was allowed in. It suffered from the same circumstances of unreliability. And our case on that, a case that I read again last night that I think is well worth reading, is Zenith v. I think it's called WY or WHTV. It's a Seventh Circuit case, and the opinion by Judge Easterbrook there makes it very clear that the mere fact that the damages expert says I'm the world's authority in this area of business, which is exactly what Trent's papers say. Nobody knows more about bingo in Texas than Mr. Hieronymus, and the fact that he operates a business in that industry is not enough. He needs to show his methodology, and he needs to have work papers to back it up so that there can be something verifiable, testable on all this. And I see that I'm running down to my time. Thank you. I'll reserve that. Thank you. Good morning. Good morning. May it please the Court, my name is Richard Chambliss. I represent the Appley and Cross appellant. Before I begin, we were talking about time and how it's going to be reserved, and at least my thought would be that I also want two minutes on solely the cross-appeal issue. All right. Great. We have a number of issues that are raised on appeal, and I would rather respond to the Court's questions than begin my presentation if the Court has questions. Let me ask you this. The summary judgment issue to me is the most difficult. If there is a triable issue, do you think that that changes to some extent the probative value of the Virginia incident when you're making that assessment, probative versus prejudicial and time consumption? Possibly, but I think it depends on how you land on the triable issue for the generic contract matter. Part of the argument by Game Tech is the 3.1 and 3.3 duties that they mention in the distribution agreement are partially Texas-based, partially Virginia-based. Well, obviously, if Virginia, you know, obviously Texas didn't go as far as Virginia, in the sense that they didn't go to Patina and all of that. So on the failure to promote, you do have, you go from contracts that say the name Game Tech to generic contracts. You have it in the context of what's happened in Virginia, you know, a threat being made. Why all of that together? And then you know in Virginia then after that happened and that they went to Patina. Why, if you give all inferences to Game Tech, why isn't that enough to go to trial on that? The Virginia matter was considered exhaustively by the trial court judge under the 403 analysis. And it was considered both at a motion and limine stage. Judge Anderson said, I'm very concerned about the 403 issues with Virginia. That was a two-week jury trial. We're scheduled for three weeks, which by the way turned into four weeks. But I'm not closing the door. I will allow Game Tech. Let's get down to submit the questions that you want about Virginia. Right, and there were a lot of questions. Okay, but that gets to why, you know, if you assume that the summary judgment was properly granted, then when you go to the 403 analysis, I agree with you that courts can say, this would take way too much time. Yeah, it's probative, but it would take way too much time, and I'm going to control this trial, and one was a longer trial, and I don't think that you can, you know, I don't want to add three weeks to the trial that I'm doing, and it isn't that probative. But still that doesn't, the summary judgment, that Virginia situation was also offered to give context to the summary judgment and why there might be a triable issue on that. And that's where I'm concerned. At the time of the summary judgment ruling, I believe Judge Anderson said in reference to the Virginia, to the discussions concerning what was going on in Virginia, Mr. Walsh, go forward on the basis that Virginia is not in this courtroom, is not going to be in this courtroom. I am not inclined to have all of the Virginia dispute become embroiled in the Texas dispute. And on that basis, Judge Anderson made the decision looking at the facts relative to the generic contract. There's a bit of a... Well, but I guess, but I hear you saying that because he wasn't going to let it in on the 403 that you can't consider it for the summary judgment, and I don't think that necessarily follows. Okay, well... I mean, I think we have to look at those two separately. And, you know, I think that there would be no doubt, obviously, if the facts in Texas were that they went from Game Tech to generic and then also contacted VATINA, that I don't think summary judgment would be proper. But Judge Anderson seemed to say something about if it had been that important for you to have Game Tech on those contracts, that would have been something that you would have stated in your agreement. So I don't think, I just don't think that that had anything to, you know, as a matter of law, I don't think that had anything to do with promotion. The decision and argument, I guess, at the summary judgment level is Judge Anderson was saying, if generic contracts were so important to you, why isn't there? And you heard Mr. Walsh's response to you. That was the same response he gave to Judge Anderson. We can't think of everything. Yes, but there was something in the contract that they would take all reasonable measures to promote Game Tech. What other reason is there than to facilitate adopting generic to facilitate a future move to a different manufacturer? The, Mr. Walsh mentioned the Texas Lottery Commission proceeding that had occurred in January of 2002. That was a proceeding in which the Texas Lottery Commission had brought a claim against both Game Tech and Trend in Texas, accusing, alleging they were involved in illegal price fixing because of the distribution agreement between Game Tech and Trend. Following that proceeding, Mr. Oronymous wanted to distance himself from the connection between Game Tech and Trend Gaming by virtue of the Texas Lottery Commission proceeding. That was the beginning of the generic contract. So that was the purpose of going generic? That was the purpose of the generic contract and the Texas proceeding. You have a Well, that's part of it. That's what he said. Yes. Now, they're saying, okay, but, you know, for summary judgment purposes, they're saying the purpose was that they're going to do what they did in Virginia, right? Correct. So the question is, you know, I can't resolve those factual disputes, but what they're saying, does that create a triable issue and should that have gone to the jury? If you look at the Texas distribution agreement and the Texas regulatory scheme for distributors and manufacturers, the generic contract does absolutely nothing to allow Trend to transfer customers, Trend's customers, to some other manufacturer. Under the distribution agreement, what Game Tech has been arguing is this distribution agreement is going to be in place for some two and a half years from the events that we're now talking about. The generic contracts that were being signed up by a small minority of the bingo conductors had a period of one year, so they would have to be renewed and renewed for a third time. At the end of the earliest period of time in which the Texas distribution agreement could be terminated was two and a half years from the end of this period of turmoil. At the end of that, if Game Tech chose to terminate the distribution agreement by the early out or early termination provision, then what did the distribution agreement provide with respect to the customers of Trend? Generic contracts meant nothing. Whatever the agreement was, we have two separate tiers of agreements. There's a distribution agreement between the manufacturer of Game Tech and Trend. This is that two and a half year agreement. Underneath that, we have a subset where Trend has individual contracts with its bingo conductors. Out of the 58 halls that are referenced in the record, 20 of those had no written agreement whatsoever. They were oral. Out of the 58, there were these five or six that were the generic contracts. But when the distribution agreement terminated, so did those generic contracts terminate. The only contract was between Trend and its customers. Those weren't assignable. Game Tech didn't inherit those contracts. They weren't assignable to Game Tech. They couldn't be assignable to Game Tech because of the regulatory provisions of Texas law. A manufacturer can only manufacture. A distributor can only distribute. A bingo conductor can only conduct bingo. None of the three can do any of the other three. Well, let's assume that's all true and Game Tech's got a loser argument. But it seems to me there's a problem. If they base their decision to terminate on what happened in Virginia, the jury need to be told about that and let that argument or defense stand or fall as it may. Part of the sleight of hand with respect to that presentation is the Texas distribution agreement was terminated August 27th or August 28th of 2002. The Virginia expiration didn't occur until one month later. Had Game Tech not terminated the Texas distribution agreement, who knows what would have happened with respect to Virginia. So the cart's a little bit before the horse here. Well, where does Bettina come in there? Bettina comes in and – Is that before the termination or is it after the termination? I believe it is before the termination, Your Honor. I'm not – give me one second here. It's very close in time. The Virginia agreement, I know that Trend signed an agreement with Bettina less than 60 days before the September 28th expiration date of the Trend-Virginia agreement. I don't remember. It would have been right about that time, and I just don't remember the Virginia facts clearly enough to tell you that Bettina is in the record. I don't believe the Bettina agreement is in the record in the Texas case. Counsel may correct me, but I'm not certain of that. It would have been right about the same time. I did – I also tried the Virginia case, and so I'm familiar with the Virginia facts. I know that it was less than 60 days of September 28th. I can't remember if it was 45 days or 38 days or 20 days. I just don't remember that. The generic contract claim in part is a red herring because it was submitted to the jury. The jury did consider, was generic contract something that was a breach of the party's agreement, and that was specifically submitted on the covenant of good faith and fair dealing. The jury considered Gametech's argument that Trend's use of generic contracts in Texas was a breach of the covenant of good faith and fair dealing, and the jury returned the verdict and said no, Trend did not breach the covenant of good faith and fair dealing by the use of generic contracts. If we would have had a different result from the jury, if the jury would have said yes, Trend breached the covenant of good faith and fair dealing, I think then there would be an argument, well, okay, that should have then been considered for the breach of the distribution agreement, a basis to terminate the distribution agreement. But in fact the deck kind of stacked low when the judge said that cannot be a basis for terminating the agreement. The deck was stacked to the extent that the judge followed his summary judgment ruling and said you're not, the court can't consider, excuse me, the jury cannot consider the breach of the covenant of good faith and fair dealing as a basis to terminate the distribution agreement. Gametech only asserted two bases for terminating the distribution agreement. Their notice of default said, one, pricing. That was really the primary issue that was in dispute between the parties. Gametech saying this pricing scheme that Trend is using doesn't give Gametech its minimum return. The facts in the case were, in fact, for the four or five inventory contracts that Gametech complained about, they made more money off those than they made off of their approved revenue share contract, and they lost that at trial. The jury said, no, that pricing is not a basis for terminating the distribution agreement. That was the primary issue that we're fighting about. We then got to the generic contract issue, and the jury said Trend's use of generic contracts was not a breach of the covenant of good faith and fair dealing. How could they have then said, but it is a more serious breach that allows you to terminate the distribution agreement? That's totally inconsistent. My argument would be that it would be an inconsistent verdict had the jury come back and said the breach of the covenant of good faith and fair dealing, Trend did breach, then we have an argument, okay, well, if the judge precluded the jury from using the breach of the covenant of good faith and fair dealing as a basis to find the termination distribution agreement, we have an argument. But, in fact, the opposite occurred. The jury considered the issue, generic contracts were put in front of them ad nauseum, and they rendered the verdict in favor of Trend on that issue. The use of the generic contracts was not a breach of the covenant of good faith and fair dealing. Now, if we find that the district court erred in excluding the evidence of the Virginia action, isn't the jury's verdict regarding the covenant of good faith and fair dealing tainted by that error, such that a new trial would be required? I believe so. I don't think you could. I think I would argue a little bit differently on the conversion issue, but when you go to the breach of the covenant of good faith and fair dealing, I think those are wrapped up in the same envelope, and those matters would go back and be tried again. Thank you. My notes indicate that on August 8th, 2002, Trend Gaming entered into a new distribution agreement with Patina on that date. And then on September 29th, the day after the Virginia agreement expired, Trend Gaming began supplying equipment from Patina. I accept those dates. I could not recall the date of the Patina agreement. All right. Excerpt of Record 83. Any other questions? Anything else I can address for the panel? No, I think you've answered our questions. Let me touch briefly. I'll talk about the Trend Damage Claim on rebuttal. I have four minutes. All right. Thank you. Thank you, Your Honors. A few points. Judge Nelson, you found the site on page 33 of our second brief. The facts in Virginia that were known or suspected by our client at the time are spelled out there on those pages. Nine of 15 of our customers in Virginia by that time, by July 18th, I'm sorry, had been switched over and were no longer speaking to us in Virginia. We were obviously trying to sign them up ourselves because we could deal directly with them in Virginia. And that was four days before we sent the notice of default and some five weeks before we terminated Trend. As Mr. Chambliss pointed out, we actually terminated Trend on August 27th, and that was about 19 days after the Patina contract was signed. Now, my client didn't have that contract, obviously. It was secret. But we knew from the marketplace that the Trend was arranging for a competitor who we thought was Patina, and that's what my client would have testified to if he had been able to take the stand. We knew those things were in place at the time. As to Mr. Chambliss's argument on good faith and fair dealing, obviously, in our view, he's got this backwards. The fact that the jury decided a good faith and fair dealing claim against my client after the kind of rulings that the trial judge entered on the generic contracts, breach of contracts, just tainted the whole thing. The trial judge had already told the jury, in essence, that we had wrongfully terminated on that basis. We'd have to sustain it on the renegade pricing. It was going to be very difficult to get a jury to agree that Trend acted in violation of a covenant of good faith and fair dealing when the judge had already basically told the jury Trend had done right by using generic contracts. So the whole thing was tainted at that point. I wanted to go back to something, Judge Callahan, that you mentioned very early on. I agree that under 403, the trial court has discretion to say it's too much time. But our case on this, out of this court, is Obrey v. Johnson. And Obrey v. Johnson, which we cite in our papers, and Henke, which we also cite, a racial discrimination case, Obrey, held that it is wrong to exclude evidence of other bad acts where it's probative of proving motive. And when that kind of evidence is excluded, prejudice is presumed. Harmless error is not presumed. Prejudice is presumed. So while the trial judge may have brought discretion, burden, because Trend prevailed on that motion in limine, shifted to Trend to show that there was no prejudice by excluding the Virginia evidence. With the power of the Virginia evidence and the fact that the jury ruled in our favor, the judge upheld it on injunctive relief, and there was a finding of clear and convincing evidence of malicious intent to deprive us of our rights in Virginia, there's no way that Trend can show that this was a harmless error ruling on the trial court's part. All right. Your time has expired. Thank you. Thank you for your argument. Your Honor, I don't, in light of this being my rebuttal on my cross-appeal, I'm deeming it inappropriate for me to respond further to the issues raised by Mr. Walsh on his rebuttal. I think you've both done a good job in your briefs on those. I think we're pretty focused on both, you know, the positions of the relative parties. Obviously, but I would defer to my colleagues in terms of if, because if they had questions in light of any of co-counsel, any of appellant's counsels, I would certainly allow them to ask. There don't appear to be any. Okay. Just very briefly, then, on our cross-appeal, there's really two separate issues there. We had two damage claims that were excluded. Primarily, the jury was allowed to award nominal damages. One was on what's called product exclusivity, the right to promote exclusively new products. The second was on the bad service claim where Trent alleged it lost halls as a result of the bad acts by Game Tech. The jury found in favor of Trent on both of those issues liability-wise. And as to damages, Judge Anderson excluded the testifying witness, Mr. Ronimus, to testify about damages under Dawbert for both of those claims. And if you – and there's a very exhaustive order by Judge Anderson following the Dawbert hearing. It's some 20 pages long. If you follow it plus the briefs, specifically when you look at the product exclusivity claim, the analysis that was used by Mr. Ronimus for product exclusivity was very similar to the analysis that was used for lost profits on damages, which Judge Anderson found to be reliable. And I would urge the same with respect to product exclusivity. The second argument I'd make on damages is under the hall services loss. My argument there is really a 701 argument as opposed to a 702 argument. There was a motion in Lemony argued at the beginning of trial in which Judge Anderson precluded Mr. Ronimus from testifying under 701 and said you can only testify under 702 as an expert witness. You can't testify basically as the owner of your own business. His ruling was because your opinions are based on more than your personal knowledge and perception, and therefore I'm precluding it. If you look to the bad service hall damage analysis, that is all Mr. Ronimus's where he went outside of his records, if you will, went to the SEC records, the Texas Lottery Commission records, and things of that nature. So under 701, Mr. Ronimus should be able to testify as to the hall loss damages. I have nothing further. Thank you. All right. Thank you both for your argument. This matter will now stand submitted. Court is now in recess until tomorrow at 9 o'clock. Thank you.
judges: D.W. Nelson, Callahan, Carney